UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------

DARIUS TENCZA and MARINA TENCZA,

                              Plaintiff,

              v.                                           10 Civ. 3752 (RJH)

TAG COURT SQUARE, LLC,                            **MEMORANDUM
                                                   OPINION AND ORDER**

                              Defendant.

--------------------------------------------------

Richard J. Holwell, District Judge:

        Plaintiffs Darius and Marina Tencza purchased a condominium apartment in

Queens, New York from defendant Tag Court Square, LLC ("TCS").  They brought this

action to enforce their right to revoke the purchase pursuant to the Interstate Land Sales

Full Disclosure Act ("ILSFDA").  TCS has moved pursuant to Federal Rule of Civil

Procedure 12(b)(6) to dismiss the complaint as time-barred and for failure to state a claim

for which relief can be granted.  For the reasons set forth below, TCS's motion is

DENIED.

                            **BACKGROUND**

        Defendant TCS is the sponsor of the Arris Lofts Condominium ("Arris Lofts")

located in the Long Island City neighborhood of Queens, New York.  In May 2007,

Plaintiffs agreed to purchase Unit 800 at Arris Lofts (the "Unit").  The exact timing of the

agreement is the subject of some dispute.   The complaint incorporates by reference the

Purchase and Sale Agreement (the "Agreement") for the Unit.  (*See* Compl. ¶ 13; Ex. A.).

The signature page of the Agreement, signed by each Plaintiff as well as TCS's agent, is

dated May 8, 2007 and provides that "the parties have executed the Agreement as of" that

date.  Accordingly, Plaintiffs allege that they "signed the Purchase Agreement" on that date.  (Compl. ¶ 13.)  However, Schedule B to the Agreement, entitled "Disclosure of Information on Lead-Based Paint and/or Lead-Based Hazards," is dated May 1, 2007, and a Rider to the Agreement related to the purchase of a storage bin at the condominium which is signed by each Plaintiff, though not by TCS, is undated.  The Rider provides that the date is "[t]o be inserted by Sponsor after countersignature by Sponsor."[1]

After tendering the balance of the purchase price, Plaintiffs closed on the Unit on May 19, 2008.  (*See* Compl. ¶ 15.)  Plaintiffs allege that TCS never provided them with a property report and never filed a statement of record with the United States Department of Housing and Urban Development ("HUD") even though the ILSFDA required TCS to do both.  (*See id.* ¶¶ 24, 27.)  Based on these alleged violations, Plaintiffs, through counsel, invoked their right to revoke the Agreement by letter to TCS dated April 23, 2009.  (*See id.* ¶ 30.)  TCS has not honored this request.  On May 6, 2010, Plaintiffs filed the instant suit to enforce their revocation.  On September 15, 2010, TCS moved [8] to dismiss the action as time-barred and for failure to state a claim for which relief can be granted.

---

[1] TCS also points to a letter dated May 4, 2007, from plaintiff Darius Tencza attaching executed copies of the Agreement as well as a deposit of $299,500.  (*See* Dec. of B. Lederman, Sept. 15, 2010 ("Lederman Dec."), Ex. B.)  That letter would suggest that Plaintiffs signed the Agreement on or before May 4, 2007.  However, "[w]hen addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent.  Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are 'integral' to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice." *Lefkowitz v. Bank of New York*, 676 F. Supp. 2d 229, 248-49 (S.D.N.Y. 2009).  Accordingly, it is not proper to consider the letter.

**LEGAL STANDARDS**

"Courts ruling on motions to dismiss must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Dickerson v. Mut. of Am.*, 703 F. Supp. 2d 283, 290 (S.D.N.Y. 2010).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.*  (quoting *Twombly*, 550 U.S. at 557).

**DISCUSSION**

**A.  ILSFDA**

Congress enacted the ILSFDA in 1968.  The statute "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  *Flint Ridge Dev. Co. v. Scenic*

*Rivers Ass'n of Okla.*, 426 U.S. 776, 778 (1976).  To that end, the statute imposes various requirements on parties who sell land via instrumentalities of interstate commerce.

"Congress, in passing the statute, desired to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development but actually under water or useful only for grazing." *Beauford v. Helmsley*, 740 F. Supp. 201, 209 (S.D.N.Y. 1990) (quoting *Winter v. Hollingsworth Properties, Inc.,* 777 F.2d 1444, 1447 (11th Cir. 1985).  "The most uncertain and risky sales, in terms of future development and use, were of large tracts of subdivided, undeveloped land.  Some such land was [un]inhabitable, and other such land, though possibly habitable, would require an enormous investment by the developer and local government to make it so."  *Bodansky v. Fifth on the Park Condo, LLC*, 635 F.3d 75, 80 (2d Cir. 2011) (internal citation omitted).

However, the statute refers generally to "the sale or lease of any lot."  *See* 15 U.S.C. § 1703(a)(1); *see also id.* § 1703(a)(2) (referring to "the sale or lease, or offer to sell or lease, any lot").  HUD has interpreted the term "lot" to refer to condominium units.  *See* 61 Fed.Reg. 13,596 (Mar. 27, 1996) ("Lot means any portion, piece, division, unit or undivided interest in land if such interest includes the right to exclusive use of a specific portion of the land or unit.  This applies to the sale of a condominium . . . as well as a traditional lot.").  And numerous courts in this district have endorsed that interpretation.  *See Bacolitsas v. 86th & 3rd Owner, LLC*, No. 09 Civ. 7158, 2010 WL 3734088, at *4 (S.D.N.Y. Sept. 21, 2010) ("Though the text of ILSA employs the term 'lots' throughout, the statute also governs condominium units.") (internal citation omitted); *Cruz v. Leviev Fulton Club, LLC*, 711 F. Supp. 2d 329, 331 (S.D.N.Y. 2010)

("While the ILSA's text refers to the sale of 'lots,' its protections apply to the sale of condominiums as well.") (internal citations omitted); *Bodansky v. Fifth on the Park Condo, LLC*, 732 F. Supp. 2d 281, 285 n.6 (S.D.N.Y. 2010) ("HUD Guidelines make it clear, and other courts have found, that a 'lot' may also mean a condominium unit."), *vacated on other grounds by* 635 F.3d 75; *Beauford*, 740 F. Supp. at 209-10 (citing *Winter*, 777 F.2d at 1448 ("HUD's inclusion of condominiums within the ILSFDA is a reasonable interpretation of Congress' original intent in enacting the statute and the only defensible interpretation. . . .")).  Accordingly, with certain exceptions discussed below, the requirements of the ILSFDA generally apply to condominium units such as the Unit Plaintiffs purchased.

The two disclosure requirements TCS allegedly violated appear in Section 1703(a)(1), which provides in relevant part:

> It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--
>
> **(1)** with respect to the sale or lease of any lot not exempt under section 1702 of this title--
>
>> **(A)** to sell or lease any lot unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title;
>>
>> **(B)** to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee;

15 U.S.C. § 1703(a)(1)(A)-(B).  Under Section 1706, a statement of record is effective when it is filed with the Secretary of HUD.  *See* 15 U.S.C. § 1706.  Thus, absent an exception, Section 1703 makes it unlawful to sell a condominium unit either (a) pursuant

to a plan that has not been filed with HUD; or (b) where a property report has not been provided to the purchaser before he or she has signed an agreement.

With respect to their Unit, Plaintiffs allege that TCS provided neither required report.  Accordingly, Plaintiffs have invoked their right to revoke the sale pursuant to Section 1703(c) which provides:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).  The instant suit seeks to enforce that right pursuant to Section 1709(b) which provides that "[a] purchaser or lessee may bring an action at law or in equity against the seller or lessor (or successor thereof) to enforce any right under subsection . . . (c) . . . of section 1703 of this title."  15 U.S.C. § 1709(b).

TCS makes four arguments as to why Plaintiffs' action should be dismissed. *First,* TCS argues that Plaintiffs' action is time-barred by the applicable three-year statute of limitations because Plaintiffs filed suit on May 6, 2008, more than three years after they signed the Agreement.  *Second*, TCS argues that Plaintiffs' action should be dismissed on equitable grounds.  *Third*, TCS argues that Plaintiffs' action is barred by a provision of the ILSFDA which requires a purchaser seeking revocation to return the unit in substantially the same condition.  *Fourth*, TCS argues that the sale at issue was exempt from the ILSFDA's requirements.  The Court considers each argument in turn.

### B.  Statute of Limitations

The applicable statute of limitations appears in Section 1711 which provides, in relevant part, that "[n]o action shall be maintained under section 1709 of this title to

6

enforce a right created under subsection (b) . . . of section 1703 of this title unless brought within three years after the signing of the contract or lease, notwithstanding delivery of a deed to a purchaser."  15 U.S.C. § 1711(b).  In this case, the statute of limitations question turns on the meaning of the term "signing."  TCS argues that "signing" has a unilateral meaning and refers to when a purchaser signs the contract.  TCS therefore contends that, because Darius Tencza's signature on Schedule B is dated May 1, 2007, Plaintiffs signed the agreement on that date—more than three years before they filed the instant suit on May 6, 2010.  Plaintiffs argue that "signing" has a bilateral meaning and refers to when both parties have signed the contract, here May 8, 2007—less than three years before May 6, 2010.

Plaintiffs argue that "the plain statutory language, in referring only to 'the signing of the contract,' should be presumed to mean the signing by *both parties*, sufficient to create a binding contract."  (Pls.' Opp'n at 6 (emphasis in original).)  It is far from clear why that should be so.  The right of revocation that Plaintiffs seek to enforce runs not from when the contract becomes effective but from when a purchaser signs it.  *See* 15 U.S.C. § 1703(c).  Hence it is not obvious that the limitation period during which a buyer may seek a remedy for that right "should be presumed" to run from the time when the contract becomes effective.

Nevertheless, Plaintiffs make a persuasive argument that, in this case, the parties agreed that they would be deemed to have signed the agreement at the time that the contract became effective.  The final page of the agreement states "IN WITNESS WHEREOF, the parties have executed this Agreement as of the date below."  The date is listed as May 8, 2007.  The parties' signatures appear below the date.

The plain meaning of "execute" as used in the agreement is "[t]o make (a legal document) valid by signing. . . ."  Black's L. Dict. (9th ed. 2009).  Thus the parties appeared to agree that they had signed the agreement as of May 8, 2007.   The Court sees no obvious reason why the parties should not be bound by the terms of their agreement as to the date on which each party executed the document.

Plaintiffs also have the better of the statutory interpretation argument because Congress used more specific language to describe the revocation right in Section 1703(c) than to delineate the statute of limitations for the remedy in Section 1711(b).  Again, Section 1711(b) refers to "three years after the signing of the contract or lease." However, Section 1703 makes it unlawful "to sell or lease any lot unless a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement *by such purchaser or lessee*."  15 U.S.C. § 1703(a)(1)(B) (emphasis added).  Under that Section, where such a report "has not been given to the purchaser or lessee in advance of *his or her signing* such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of *such signing*."  15 U.S.C. § 1703(c) (emphasis added).   If "the signing" as used in Section 1703(c) had a unilateral meeting, the phrases "by such purchaser or lessee" and "his or her" as well as the word "such" would be superfluous. Yet such an interpretation would violate the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 99 (2d Cir. 2009) (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001)).

Congress could have used "such signing" merely for convenience. However, that seems unlikely in light of the rest of Section 1703. Like Section 1703(c), Sections 1703(b) and (d) first identify the prerequisites to revocation and then provide for a time period to revoke as of right. However, whereas Section 1703(c) refers to a report "given to the purchaser or lessee in advance of *his or her signing*" and revocation "two years from the date of "*such* signing," the other sections provide for revocation in a period "following *the* signing of such contract or agreement." 15 U.S.C. § 1703(b), (d) (emphasis added). That makes sense because the predicates for revocation in these companion sections have nothing to do with whether the seller has done something prior to the purchaser's signing of the contract. Rather, Section 1703(b) provides for revocation as of right within seven days of "the signing" and Section 1703(d) provides for revocation within two years of "the signing" if the "contract or agreement" itself "does not provide" certain information.

In that context, Congress's decision to use "such signing" instead of "the signing" seems more like a deliberate choice than an oversight or shorthand. If "the signing" had a unilateral meaning, Congress could have written Section 1703(c) just as it wrote Sections 1703(b) and (d) to provide that where a report "has not been given to the purchaser or lessee in advance of *the signing* of such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of *the signing*." But Congress did not write the statute that way. Rather, Section 1703(c) provides that where a report "has not been given to the purchaser or lessee in advance of *his or her signing* such contract or agreement, such contract or

agreement may be revoked at the option of the purchaser or lessee within two years from the date of *such signing*." 15 U.S.C. § 1703(c) (emphasis added).

Congress's decision to use more specific language in the very same section where it used the general phrase "the signing" suggests that "the signing" does not have a unilateral meaning in Section 1703.   And since "it would be needlessly untidy and confusing, absent good reason, to have one term mean two different things in a single statutory scheme," *Drescher v. Shatkin*, 280 F.3d 201, 205-6 (2d Cir. 2002), it would make little sense if "the signing" had a bilateral meaning in Section 1703 but a unilateral meaning in Section 1711(b).  Indeed, that reading "would conflict with 'the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'"  *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2004) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570 (1995)).

Giving a bilateral meaning to "the signing" also avoids inexplicable results.  The three-year statute of limitations in Section 1711(b) running from "the signing of the contract or lease" applies to an action "under section 1709 of this title to enforce a right created under subsection (b), (c), (d), or (e)" of Section 1703.  15 U.S.C. § 1711(b). Since, unlike the predicates for revocation in Section 1703(c), the predicates for revocation in Sections 1703(b) and (d) do not appear to refer to an action prior to the purchaser's signing of the contract, if "the signing" in Section 1711(b) referred to the purchaser's signing, then the statute of limitations applicable to actions to enforce timely revocation under Sections 1703(b) and (d) would run from a time that has nothing to do with the underlying right.  That is, while TCS argues that a unilateral interpretation of "the signing" would harmonize the time limit on a remedy for a Section 1703(c) violation

with the underlying right, that interpretation would do just the opposite with respect to Section 1703(c)'s companion sections.  That is reason to doubt TCS's interpretation.

Of course, TCS might argue that, because Section 1711(b) refers to "the signing" with respect to Sections 1703(b), (c), (d), and (e), the Court must, in any event, divorce the time limit on the remedy from the right:  either "the signing" has a unilateral meaning, in which case the statute of limitations will run from a time that has nothing to do with rights provided for in Sections 1703(b) and (d), or "the signing" has a bilateral meaning, in which case the statute of limitations will run from a time that has nothing to do with the right provided for in Section 1703(c).   However, as between the two interpretations, the Court presumes the correctness of the interpretation which gives purpose to every word in the statutory text unless there is reason to believe that Congress intended the contrary.  For the reasons set forth above, giving bilateral meaning to "the signing" avoids rendering superfluous the phrases "by such purchaser or lessee," "his or her," and "such."   And the Court cannot discern any reason why Congress would have used such specific language in Section 1703 to describe the purchaser's signing when Congress meant the same thing by much more general language in numerous other places in the same statute.  Perhaps it is no more explicable why Congress would have wanted the two-year limit on revocation as of right under Section 1703(c) to run from the time the purchaser signs but the three-year limit on IFLSDA lawsuits to enforce that right to run from the time the seller signs.[2]  But the Court's role is to apply Congress's text, not to

---

[2] Indeed, TCS argues that "measuring accrual of the statute of limitations from the moment a plaintiff signs a contract, regardless of whether it has been countersigned by the seller, is mandated because the violation is the failure to provide a disclosure statement before the purchaser signs."  (TCS Br. at 10).  However, that argument makes little sense when considered in light of the broader statutory scheme.  *Cf. Saks v.*

justify it.  Where there is no justification to read words out of that text, the Court will not

do so simply because Congress has been no clearer than mud.

---

*Franklin Covey Co.,* 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.").  Section 1703(a) obligates sellers of land to provide property reports to purchasers before they sign a contract.  Where the seller has not complied with the obligation, Section 1703(c) gives a purchaser the right to revoke within two years.  That is, the right to revoke arises when the seller has failed in his obligation.  And that right is automatic in the sense that the purchaser must prove only (a) that he or she signed the contract and (b) that the seller never provided the report.  *Cf. Bodansky*, 635 F.3d at 81 ("Aside from the requirement that the purchaser revoke within 2 years of signing and bring suit (if necessary) within 3 years of signing, Congress provided no statutory affirmative defenses in favor of the developer.  Congress gave the purchaser an exclusive option to exercise her right to void the contract, upon showing that she signed the contract before receiving a property report.").  Section 1709(b) creates a cause of action for a purchaser who has revoked as of right within two years from when he or she signed the contract to enforce that right in court.  *See* 15 U.S.C. § 1709(b).  And Section 1711 provides a statute of limitation for that cause of action.

However, a suit under Section 1709(b) to enforce timely revocation as of right under Section 1703(c) is not the only way that a purchaser who has not been provided with a property report could seek relief in federal court.  Section 1709 also creates a cause of "action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a)," which requires a seller to provide a property report.  15 U.S.C. § 1709(a).  Under that provision, a purchaser who has not timely revoked as of right can still maintain a suit to revoke within "three years after the date of signing of the contract of sale or lease."  15 U.S.C. § 1711(a)(1).  Yet such a purchaser may have to show that the failure to provide a property report was material.  *See, e.g.*, *Plant v. Merrifield*, 711 F. Supp. 2d 576, 591-92 (E.D. Va. 2010) (holding, *inter alia*, that a plaintiff who had not timely invoked the Section 1703(c) right could maintain an action under Section 1709(a) if the plaintiff could show an equitable basis for relief).

Against this background, a reason emerges as to why Congress decided to measure the two-year limit on revocation as of right under Section 1703(c) from when the purchaser signs the contract but the three-year limit on IFLSDA lawsuits from the time the seller signs the contract.  Revocation under Section 1703(c) is as of right and liability for the reporting failure that triggers the right is strict.  *Cf. Bodansky*, 635 F.3d at 81.  Consistent with the "generally disfavored status" of such liability, *United States v. United States Gypsum Co.*, 438 U.S. 422, 437-38 (1978), Congress may have found it fair to burden the purchaser with the consequences of any delay in revoking as of right.  However, because a statute of limitations benefits a putative defendant seller, with respect to the purchaser's right to enforce revocation as of right in a judicial proceeding, Congress may have wanted to give the purchaser the benefit of any delay by the seller in signing the contract.

12

TCS also seeks refuge in the legislative history.  TCS notes that the original statute of limitations for actions to enforce revocation was three years from the time of "sale" and argues that the "change in statutory language necessarily means something." (*See* TCS Reply at 4.)   However, TCS does not explain why Congress would have changed "sale" to "signing" other than to suggest that this change was made to synchronize the statute of limitations with the "purpose of the disclosure provisions which form the basis of the plaintiffs' claims," namely, "to provide information *before* the plaintiffs sign regardless of when the sponsor countersigns." (*Id.* (emphasis in original).)  Yet comparing ILSFDA as originally enacted to the statute as amended demonstrates that Congress would have had more reason to leave the statute of limitations alone, rather than amend it, if Congress intended for the statute of limitations for suits like this one to run from the time the purchaser signs.

The precursor to the current Section 1703(c) provided that "[a]ny contract or agreement for the purchase or leasing of a lot in a subdivision covered by this title, where the property report has not been given to the purchaser in advance or at the time of his signing, shall be voidable at the option of the purchaser."  Pub. L. 90-448, § 1404(b), 82 Stat. 590, 592 (1968).  The precursor to Section 1709 provided that "[a]ny developer or agent, who sells or leases a lot in a subdivision—(1) in violation of section 1404 . . . may be sued by the purchaser of such lot."  Pub. L. 90-448, § 1404(b), 82 Stat. 590, 595 (1968).  And the original statute of limitations provided that, "if the action is to enforce a liability created under Section 14[04](b)(1)," it must be "brought within two years after

the violation upon which it is based" and "in no event . . . more than three years after the

sale or lease to such purchaser."  Pub. L. 90-448, § 1412 (b), 82 Stat. 590, 596 (1968).[3]

       Since the "violation" of failing to provide a property report to a purchaser before

he or she signs occurs when the purchaser signs, the original statute of limitations

applicable to a suit by such a purchaser ran from the time the purchaser signed.  *See, e.g.,*

*Fogel v. Sellamerica, Ltd.*, 445 F. Supp. 1269, 1275 (S.D.N.Y. 1978) ("The express terms

of the statute make clear that failure to furnish the purchaser with a property report is a

violation of s[ection] 1703(a)(1) which occurs at 'the signing of the contract or agreement

for sale.' Consequently, it is at that time that the statute of limitations commences.").  If

Congress intended the statute of limitations to run from that time, the more logical course

would have been *not* to amend the statute.  Congress, however, did amend the statute by

adding rights to revoke after "the date of the signing" for various other reasons, *see* 15

U.S.C. §§ 1703(b), (d); by amending the provision for revocation as of right by a

purchaser who has not received a property report to refer to "such signing," *see* 15 U.S.C.

§§ 1703(c); and by replacing the statute of limitations with the current text that refers to

"the signing."  *See* 15 U.S.C. §§ 1711(b).  Taken together, and considered against the

background presumptions of statutory construction, these contemporaneous amendments

---

[3] The reference to both two years and three years in the statute of limitations is as
puzzling now as it was prior to the 1979 amendment.  That alone militates against giving
the amendment much weight.  Nevertheless, noting that "In no event" is strong and
unambiguous language," one court in this district reasoned that "i[t] may be that the last
sentence of s[ection] 1711 means only that the two year limitations period normally
applicable to suits under s[ection] 1709(b)(1) (s[ection] 1703) can be tolled for no more
than one year on violations arising at the time of the sale."  *Husted v. Amrep Corp.*, 429
F. Supp. 298, 306 (S.D.N.Y. 1977).  If the "three years after the sale" provision was
intended to make the statute of limitations shorter than usual, Congress's decision to
replace that provision, if anything, suggests that Congress intended to expand the statute
of limitations.

suggest that "such signing," which refers to the purchaser's signing, has a different meaning than "the signing," which logically refers to the signing by both parties.

Finally, at oral argument, TCS contended that the Second Circuit's recent decision in *Bodansky*, 635 F.3d 75, has settled the issue to the contrary. As relevant here, *Bodansky* involved an exemption for "the sale of lease of lots in a subdivision containing fewer than one hundred lots which are not exempt. . . ." 17 U.S.C. § 1702(b)(1). The question was when the number of lots should be determined. The Second Circuit reasoned that, based on the plain language of the statute, "ILSA's 100-lot exemption is determined at the time of the "the sale or lease' of the lot." 635 F.3d at 83. Since "[i]n the context of ILSA's 100-lot exemption, 'the sale or lease' of a lot occurs on the date of signing a contract or agreement to purchase or lease the lot," *id.*, the *Bodansky* court held that "a lot's eligibility for the 100-lot exemption is determined as of the time a purchaser or lessee signs a contract to purchase or lease that lot." *Id.* at 87.

That conclusion was not an interpretation of the term "signing" as used in the statute of limitations. Indeed, that issue was not before the *Bodansky* court. Rather, that court used the phrase "the time a purchaser or lessee signs a contract" in expounding upon the consequences of its own reasoning that "'the sale or lease' of a lot occurs on the date of signing a contract or agreement to purchase or lease the lot." *Id*. at 83. Notably, in doing so, the Court did not define its own use of the term "signing." In those circumstances, the Court cannot conclude that *Bodansky* determined the meaning one way or the other of "the signing" as used in the statutory text.[4]

---

[4] For the same reason, none of the cases cited by TCS counsels a different result. *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98 (5th Cir. 1978) is inapposite for two reasons: (1) it was decided prior to the 1979 amendment to the statute of limitations; and

The same is true of the Second Circuit's statement that "ILSA's statute of limitations provisions show[] that the 100–lot exemption is determined at signing, and not after an event that happens at an indefinite point thereafter." 635 F.3d at 83. A close reading of the *Bodansky* opinion shows that the Second Circuit referred to the statute of limitations provision as evidence that "[t]he interlocking protections Congress provided in ILSA offer purchasers the ability to make an informed decision at the time they sign a contract to purchase or lease a lot." *Id.* Specifically, the court cited the contrast between the statute of limitations for enforcing the right to revoke where no property report has been provided, which runs from "the signing," with the statute of limitations for fraud or other similar violations, which runs from the time that the plaintiff should have discovered the violation. *See id.* (citing 15 U.S.C. § 1711(a)(1), (b)). That evidence was important because, unlike a rule determining the number of lots after all lots have been built, "[d]etermining at contract signing whether the 100–lot exemption applies to a purchased or leased lot allows the purchaser or lessee to learn soon after signing whether she may revoke her contract if she did not receive a property report in advance of signing." *Id.* at 84. "Such timing is most consistent with the text of the exemption and with ILSA's 2–year revocation provision and 3–year statute of limitations" because neither of those provisions "suggest[s] that purchasers must wait an indefinite period after

---

(2) the court's statement that "[t]he statute . . . directs us to focus on when the purchaser signed the contract" referred to when a seller must provide a property report, not when the statute of limitations begins to run. *Id.* at 100. Similarly, the statement of the court in *Princeton Homes, Inc. v. Virone*, 612 F.3d 1324 (11th Cir. 2010) that "the statute focuses on the moment when the contract of sale is signed," *id.* at 1333-34, referred to when a "sale" occurs for purposes of an exemption not relevant here, not to when the statute of limitations begins to run. And the court in *Orsi v. Kirkwood*, 999 F.2d 86, 89 (4th Cir. 1993) merely held that the statue of limitations begins to run at the time the contract was signed and not when the sale closes; the court did not address whether "signing" has a unilateral or bilateral meaning.

signing to determine whether the developer was required to provide a property report in advance of their purchase or lease of the lot." *Id.*

Again, in referring to the statute of limitations, the Second Circuit did not define "signing" and never considered the meaning of that term in the statute of limitations. Rather, the *Bodansky* court referred to the statute of limitations to make the point that measuring the 100-lot exemption when building is complete could result in delaying the determination of whether a purchaser has a right to report until after the purchaser has no remedy for that right. But giving bilateral meaning to "the signing" in the statute of limitations would hardly implicate the Second Circuit's concern about leaving a purchaser uncertain of his cause of action until his time to file it has expired. On the contrary, such a rule would, if anything, give a purchaser the benefit of any time between his signing and the seller's signing. In those circumstances, *Bodansky* does not give the Court reason to dispense with the assumption that Congress did not use superfluous language in Section 1703 to mean the same thing as far more general language that Congress used repeatedly elsewhere in the statute. *Bodansky* held no such thing. Rather, the Court concludes that the statute's specific references to the purchaser's signing have a different meaning than the simple phrase "the signing," which must refer to when both parties have signed.

Applying that definition of "the signing," the statute of limitations began running on May 8, 2007, the date that TCS signed the contract. The instant suit was filed on May 6, 2007, less than three years later. Accordingly, the instant suit is timely.

### C.  Equitable Defenses

TCS argues that general equitable principles bar Plaintiffs' action.  With the exception of *laches*, TCS does not specify any such principles.  Instead, arguing that Plaintiffs have "buyer's remorse," TCS makes the largely conclusory argument that "rescission at this point would be a windfall to plaintiffs, and unfair to defendant" because "[i]t is impossible to restore the status quo under circumstances where plaintiffs purchased a newly renovated Unit at the height of the real estate market and have actually lived in it for two years."  (TCS Reply at 14.)

The Second Circuit recently rejected a very similar argument in *Bodansky*.  *See* 635 F.3d at 86.  The plaintiffs in that case purchased residential condominium units in a high-rise building on Fifth Avenue in Manhattan without having received a property report prior to signing purchase contracts.  *See id.* at 77.  The plaintiffs timely revoked the purchases, the defendants refused to honor them, and the plaintiffs and brought suit to enforce their revocations.  *See id.*  The district court granted summary judgment to the defendants on the ground that the condominiums were exempt under ILSFDA.  *See id* at 77-78; *Bodansky, LLC*, 732 F. Supp. 2d 281.  When the Second Circuit held that decision was error, the defendants argued that the judgment should be affirmed on the basis of "basic concepts of equitable jurisprudence. . . ."  635 F.3d at 86.  Specifically, the defendants argued that the plaintiffs had "buyer's remorse"; that plaintiffs were "in no way, shape or form the types of purchasers which ILSA was enacted to protect in the first place"; and that "equity should not aid people who under such circumstances [of changes in the economy] make no allegations of fraud."  *Id.* (brackets in original).

The Second Circuit rejected that argument:

The statutory text enacted by Congress is clear and unambiguous. Congress enacted a registration and disclosure scheme for certain interstate land sales—modeled on the Securities Act of 1933—and provided that if a developer violated the disclosure requirement, then the purchaser could revoke the agreement within 2 years of contract signing. Pointedly, Congress gave purchasers an exclusive right to revoke and did not provide for affirmative defenses other than the revocation and limitations periods. To the extent Borden questions the wisdom of Congress's statutory scheme, we note that Congress enacted a strict-liability revocation provision to (1) ensure that registration and disclosure in fact occurs, (2) limit the costly oversight of federal agencies into an activity traditionally regulated by state and local governments, and (3) allow unsophisticated purchasers to enforce their rights. Congress passed ILSA at a time when mail fraud statutes and common law fraud doctrines appeared ineffective to check the abuses in the land sales industry, in part because both required plaintiffs to show reliance and quantify damages as a result of a developer's material misrepresentation or omission. [Defendant], by seeking to graft such a requirement onto ILSA, would disregard a key reason Congress enacted ILSA.

*Id.* Thus it appears to be the law of this Circuit that equitable defenses are not applicable in actions to enforce the automatic right to revoke under Section 1703(c). Accordingly, those defenses cannot provide a basis for dismissal of the instant suit.

### D. 15 U.S.C. 1703(e)

Relying on Section 1703(e), TCS argues that Plaintiffs cannot enforce their right to revocation because they cannot return their unit "in a condition which is substantially similar to the condition in which [it was] conveyed." (TCS Reply at 15.) Section 1703(e) provides in relevant part:

If a contract or agreement is revoked pursuant to subsection . . . (c) . . . of this section, if the purchaser or lessee tenders to the seller or lessor (or successor thereof) an instrument conveying his or her rights and interests in the lot, and if the rights and interests and the lot are in a condition which is substantially similar to the condition in which they were conveyed . . . such purchaser or lessee shall be entitled to all money paid by him or her under such contract or agreement.

15 U.S.C. § 1703(e). TCS argues that "when a purchaser of a luxury residential condominium moves into a newly renovated unit, by definition it is impossible for the purchaser to convey the unit in a substantially similar condition." (TCS Reply at 15.)

However, TCS cites no authority for that proposition and the Court is aware of none. Moreover, on the present record, there is no basis to determine whether Plaintiffs' unit is "in a condition which is substantially similar to the condition in which [it was] conveyed."   Accordingly, dismissal on the basis of Section 1703(e) is unwarranted.

**E.   "Improved Land" Exemption**

"ILSA's registration and disclosure requirements do not apply to all lots sold or leased."   *Bodansky*, 635 F.3d at 81.   Rather, ILSFDA exempts various kinds of land sales from the statutory requirements.   TCS argues that one of these exemptions applies to the sale at issue and bars Plaintiffs from asserting any rights under ILSFDA.   The relevant exception provides:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to--
>
> (2) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years. . . .

15 U.S.C. § 1702(a)(2).[5]   TCS argues that "[t]he plain language of 15 U.S.C. § 1702(a)(2) exempts land improved by an industrial building" and that "[t]he development in question was not a development of 'an unimproved tract of land'" but instead had been improved by a pre-existing industrial building.  (TCS Br. at 17.)  Plaintiffs respond that the "argument conflicts with HUD's interpretation of the 'improved lot exemption.'"  (Pls.' Opp'n at 20.)

---

[5] The part of the exemption for "the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years" is not at issue here.

That argument puts the cart before the horse.  "Because HUD is charged with administrating ILSA, it has authority to issue appropriate regulations regarding ILSA, and has indeed promulgated regulations regarding ILSA. . . ."  *Bodansky*, 635 F.3d at 82 (internal citation omitted).  However, the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "first instructs [courts] to ask whether Congress has spoken directly on the issue, that is, whether the statute in question is unambiguous."  *New York Pub. Interest Research Group, Inc. v. Johnson*, 427 F.3d 172, 179 (2d Cir. 2005).

On its face, the exemption does not appear to apply to urban condominiums for two reasons.[6]  First, whereas the statutory requirements apply to "the sale or lease of any *lot* not exempt," 15 U.S.C. § 1703(a)(1) (emphasis added), the exemption refers to "improved *land*."  15 U.S.C. § 1702(a)(2) (emphasis added).  While HUD and the courts have interpreted "lot" to include condominiums generally, *see* 61 Fed.Reg. 13,596, it is less clear that "land" includes condominiums on the upper floors of high-rise buildings. Indeed, the common sense meaning of "land" is "[a]n immovable and indestructible three-dimensional area consisting of a portion of the *earth's surface*, the space above and below the surface, and everything growing on or permanently affixed to it."  Black's L. Dict. (9th ed. 2009) (emphasis added).  Consistent with that common sense surface-tethered meaning, "improved land" generally connotes "land occupied by buildings and structures."  *Id.*  On that definition of "land," the exemption does not apply to high-rise condominium units.

---

[6] Although in *Bodansky* stated that "defendants acknowledge[d] that plaintiffs purchased their lots before those lots could be considered 'improved land on which there is a residential, commercial, condominium, or industrial building,'" *Bodansky*, 635 F.3d at 82, for that very reason the court did not consider the applicability of the exemption.

On the other hand, at least two courts in this district have applied Section 1702(a)(2) to condominium units in high-rise buildings.  *See, e.g., Cruz*, 711 F. Supp. 2d at 335-37 (applying exemption for "the sale or lease of *land* under a contract obligating the seller or lessor to erect such a building thereon within a period of two years") (emphasis added); *Beauford*, 740 F. Supp. at 210 (applying "improved land" exception to sale of completed condominium units).  While these courts did not have occasion to consider the meaning of "land," their application of the term to include high-rise condominium units accords with a more general meaning of "land" in the law of property, namely, "[a]n estate or interest in real property. . . ."  Black's L. Dict. (9th ed. 2009).

Yet even if the term "land" includes the real estate on the eighth floor of a high-rise building in which the owner of a condominium has a legal interest, it is hard to understand exactly what it would mean for "a residential, commercial, condominium, or industrial *building*" to exist on such land.   A high-rise condominium apartment such as Plaintiffs' Unit is not a "building"; it is one apartment in a building.   But it makes no sense to speak of a building sitting on an apartment. The most logical conclusion to draw from that fact would be that Congress did not intend for the "improved lot" exemption to apply to urban condominiums of any kind.   If so, "that is the end of the matter." *Chevron*, 467 U.S. at 842.

However, this conclusion would lead to the strange result that one who owns a parcel with a commercial building, say, an office building, and sells it as prospective stand-alone condominiums is not subject to ISLDFA, whereas the person who buys a factory and sells the warehouse floor inside as prospective apartment condominiums must

comply with the requirements of the statute.  It is far from clear why Congress would

have wanted to protect a purchaser in the latter case but not in the former.   Just as "[a]

fraudulent out-of-state sale of land is not rendered any less fraudulent if the condominium

form of ownership is utilized," *Beauford*, 740 F. Supp. at 210 (quoting *Winter,* 777 F.2d

at 1448), the risk that the exurban office park will never become the charming single-

family homes the seller has promised seems no less serious than the risk that the shop

floor will never be the sleek loft apartments that the seller is advertising.  In short, there is

little reason to conclude that the applicability of ILSDA should turn on whether the

prospective condominiums have their feet on the ground.

  Against that background, the possibility emerges that Congress may have

intended for the term "building" to refer not only to a "building" in the sense of a discrete

structure but also to something built or *part* of a building, such as a condominium

apartment.  To the extent that this possibility renders the meaning of the statute

"ambiguous with respect to the specific question at issue," the Court "must consider

'whether the agency's answer is based on a permissible construction of the statute,'" and,

if so, "must defer to it."  *Medina v. Gonzales*, 404 F.3d 628, 633-34 (2d Cir. 2005)

(quoting *Chevron*, 467 U.S. at 843).

  HUD's  regulations provide that "for a condominium unit sale to be exempted

from the act, it must accordingly qualify for exemption:  i.e., either it must be completed

before it is sold, or it must be sold under a contract obligating the seller to erect the unit

within two years from the date the purchaser signs the contract of sale."  38 Fed.Reg.

23,866 (Sept. 4, 1973).  HUD has subsequently defined "complete" as "physically

habitable and usable for the purpose for which it was purchased.  A residential structure,

for example, must be ready for occupancy and have all necessary and customary utilities extended to it before it can be considered complete." 61 Fed. Reg. 13,596 (Mar. 27, 1996).  Plaintiffs argue that because TCS "does not claim that the plaintiffs' unit was 'physically habitable and usable for the purpose for which it was purchased' at the time of sale . . . . the sale is not eligible for the improved lot exemption."  (Pls.' Opp'n at 22.)

    However, HUD's interpretation of the statutory text to mean a "completed" condominium writes the words "land," "residential," "commercial," and "industrial" out of the statute.  The statute exempts "improved land on which there is a residential, commercial, condominium, *or* industrial building."  15 U.S.C. § 1702(a)(2) (emphasis added).  Hence the statutory exemption turns not on what is being built, but where it is being built.  If the statute referred only to "improved land on which there is a condominium building," HUD's interpretation might make sense.  But the statute also refers to residential, commercial, and industrial buildings as well.  To the extent that (a) "land" refers to a condominium apartment and (b) "building" can mean a part of a building—as they must if the exemption can even apply to an urban condominium—the plain language of the statute seems to exempt conversions of square footage from warehouse shelving or a shop floor into a residential apartment organized under condominium ownership.  Since HUD's interpretation would not exempt such conversions, it is not entitled to deference.  *See New York Pub. Interest Research Group*, 321 F.3d at 324.

    Thus it would appear that both parties are mistaken.  The plain language of the statute that, according to TCS, exempts converted urban condominium units appears to say just the opposite.  And, the HUD regulations that, according to Plaintiffs, render the

exemption inapplicable are unfaithful to the text of the statute, if they even apply at all. In another case, this dilemma might prove a vexing one, but not here. As noted above, if the "improved land" exemption does not apply to an urban condominium, then TCS's argument fails. Yet the same is also true even if the "improved land" exemption, reasonably interpreted, does apply to an urban condominium.

As noted above, because it makes no sense to speak of a building sitting on an apartment, the "improved land" exception can only apply to an urban condominium if (a) "land" refers to a condominium apartment and (b) "building" can mean a part of a building. In that case, the statute would direct the analysis to whether the square footage where the condominium is being converted was previously "improved." In other words, the land "at issue in this case is not the land on which the condominium building sits, but rather the space within the building envelope in which the specific condominium units were to be built." *Nu-Chan, LLC v. 20 Pine Street LLC*, No. 09 Civ. 00477, 2010 WL 3825734, at *4 (S.D.N.Y. Sept. 30, 2010). Much like TCS here, the defendant in *Nu-Chan* argued "that because there was an office building with working utilities located on the land at the time of sale, the land was therefore "improved" and was thus subject to the first portion of § 1702(a)(2)." *Id.* at *3. Noting that "[a]lthough there was an office building on the land at the time of the sales at issue . . . . the specific units at issue did not physically exist in any form," the *Nu-Chen* court held that the units at issue could not be "complete" within the meaning of the HUD regulations. *Id.*

Though the Court has taken a different view of the HUD regulations, the *Nu-Chen* court's focus on the "space within the building envelope in which the specific condominium units were to be built" is instructive. Plaintiffs' Unit was built as part of a

two-floor addition to the pre-existing six-floor industrial building.  (*See* Dec. of Stephen
Orel, Oct. 29, 2010, Ex. B at 2.)  Hence Plaintiffs' unit was almost literally a castle in the
air:  there was nothing—never mind a "building" or a part of a building—in the space
where the unit currently exists.   In that case, to the extent that the "improved land"
exemption applies to an urban condominium conversion, there is no basis to conclude
that a statute intended to protect purchasers from buying properties that were more
figurative than real does not apply to Plaintiffs' unit.  Accordingly, even if the exemption
could apply to the type of property at issue, dismissal on that basis is unwarranted here.

## CONCLUSION

For the reasons stated above, defendant's motion [8] to dismiss is DENIED.


SO ORDERED.

Dated: New York, New York
       August **12**, 2011

                                        _____
                                             Richard J. Holwell
                                        United States District Judge