UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                     :

DARIUS TENCZA and MARINA TENCZA,       :
                                                     :

                          Plaintiffs,        :              10 Civ. 3752 (PAE)
                                                     :

                   -v-                        :              OPINION & ORDER
                                                       :

TAG COURT SQUARE, LLC,                      :
                                                      :

                           Defendant.          :
                                                      :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

         Darius and Marina Tencza (collectively, "the Tenczas") bring this suit against

condominium developer/sponsor TAG Court Square, LLC ("TAG") under the Interstate Land

Sales Full Disclosure Act ("ILSA"[1]), 15 U.S.C. §§ 1701 *et seq.*  The Tenczas seek to revoke

their purchase of a condominium unit pursuant to ILSA, because, they allege, TAG failed to file

a statement of record with the Secretary of Housing and Urban Development ("HUD")[2] and to

provide a statutorily-required property report.  The parties have cross-moved for summary

judgment.

---

[1] The statute is also abbreviated as "ILSFDA."

[2] Historically, and at the time the Tenczas purchased the condominium at issue in this case, ILSA
required that the statement of record be filed with HUD.  However, under the Dodd-Frank Wall
Street Reform and Consumer Protection Act, Pub. L. No. 11–203 (2010) (codified in part at 12
U.S.C. §§ 5481–5603), rulemaking and other authority historically vested in HUD under ILSA
was transferred to the newly created Consumer Financial Protection Bureau ("CFPB").  *See* 12
U.S.C. § 5581 (transferring "[a]ll consumer protection functions" under ILSA to the CFPB); *see
also Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 675 n.1 (2d Cir. 2012).  Accordingly,
the regulations cited herein, although initially promulgated by HUD, are today administered by
the CFPB.  Because HUD was the agency charged with administering ILSA during the time
period of this case, however, the Court will refer to that agency in this Opinion.

For the reasons that follow, the Tenczas' motion for partial summary judgment as to liability is granted, and TAG's motion for summary judgment is denied.

I.     **Background**

A.     **ILSA**

Congress enacted ILSA in 1968 to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 778 (1976).  To achieve this goal, ILSA imposes certain disclosure requirements on developments.  Relevant here, ILSA "requires developers to submit 'a statement of record' to HUD, and wait until such statement is 'in effect' . . . before selling or leasing any nonexempt lot." *Bodansky v. Fifth on Park Condo, LLC*, 635 F.3d 75, 81 (2d Cir. 2011) (citing 15 U.S.C. § 1703(a)(1)(A)).  With respect to nonexempt lots, ILSA also makes it unlawful to sell or lease any lot where a property report has not been provided to the purchaser before he or she has signed an agreement.  15 U.S.C. § 1703(a)(1)(B).  The statement of record and property report must include, among other information, a legal description of the subdivision, a statement of the condition of title to the land, copies of the deed, and information about the developer, including financial statements.  *Id.* §§ 1705, 1707.

Certain types of sales are exempted from ILSA's disclosure requirements.  The single exemption relevant here is the so-called "Improved-Lot Exemption," which excuses from compliance with ILSA "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building." *Id.* § 1702(a)(2).

Congress provided that if a developer sells or leases a nonexempt lot in violation of this disclosure provision, "such contract or agreement may be revoked at the option of the purchaser

2

or lessee within two years from the date of such signing."  *Id.* § 1703(c).  The Tenczas seek to enforce that right pursuant to § 1709(b), which provides a cause of action at law or in equity to the purchaser against the seller or lessor.

**B.    Facts**[3]

The Tenczas are residents of New York City.  Pl. 56.1 ¶ 1.  TAG is a Delaware limited liability company.  Pl. 56.1 ¶ 2.

The property at issue in this case is the Arris Lofts Condominium (the "Condominium"), located at 27-28 Thomas Avenue, Queens, New York.  Pl. 56.1 ¶ 5.  TAG is the sponsor of the Condominium and of its conversion from industrial use, pursuant to an offering plan and amendments filed with the New York Law Department (the "Offering Plan").  Pl. 56.1 ¶ 6; Def. 56.1 ¶ 1.  The Condominium consists of 237 residential units, 17 work studies, and 102 storage

---

[3] The Court's account of the underlying facts of this case is drawn from the parties' pleadings and their submissions in support of and in opposition to the instant motions—specifically, Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pl. Br.") (Dkt. 51); Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def. Br.") (Dkt. 57); Memorandum of Law in Further Support of Plaintiffs' Motion for Partial Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl. Reply") (Dkt. 60); Defendant's Memorandum of Law in Further Support of Cross-Motion for Summary Judgment ("Def. Reply") (Dkt. 64); the Declaration of Michael E. Fleiss ("Fleiss Decl.") (Dkt. 52, 62) and attached exhibits; the Declaration of Todd E. Soloway ("Soloway Decl.") (Dkt. 56) and attached exhibits; the Affidavit of Darius Tencza ("Tencza Aff.") (Dkt. 61); Plaintiffs' Local Rule 56.1 Statement of Material Fact ("Pl. 56.1") (Dkt. 53); Defendant's Local Rule 56.1 Responses to Plaintiffs' Statement of Material Fact and Counterstatement of Additional Material Facts ("Def. 56.1") (Dkt. 58); and Plaintiffs' Reply 56.1 Statement (Dkt. 63).  Citations to a party's 56.1 statement incorporate by reference the documents cited therein.

Because the parties have cross-moved for summary judgment, each party has submitted its own numbered 56.1 statements, each beginning at number 1.  Thus, there are duplicative numbered paragraphs (*e.g.*, the Tenczas' initial ¶ 1, as well as their response to TAG's ¶ 1).  To avoid confusion, the Court's citations to a party's 56.1 statement incorporate by reference the opposing party's response to that statement.

bins, all of which (save one residential unit) were offered for sale under the Offering Plan.  Pl. 56.1 ¶¶ 8–9.

It is undisputed that TAG did not file a statement of record for the Condominium with HUD.  Pl. 56.1 ¶¶ 18, 55.

During a two-to-three month period in 2007, the Tenczas visited the Condominium three or four times.  Def. 56.1 ¶ 8.  In May 2007, the Tenczas and TAG entered into a purchase agreement ("the Purchase Agreement") for Unit 800 (the "Unit") of the Condominium.  Pl. 56.1 ¶ 19; Def. 56.1 ¶ 28.  Under the Purchase Agreement, the Tenczas were to pay $2,995,000 for Unit 800, with $299,500 due at the signing.  Pl. 56.1 ¶¶ 25–26; Def. 56.1 ¶ 32.

On May 8, 2007, pursuant to a rider to the Purchase Agreement, the parties agreed to make certain modifications to the Unit.  *See* Fleiss Decl. Ex. 8 (the "Rider").  Although the parties disagree on the various facts of the negotiations that led to the Rider, *see* Pl. 56.1 ¶ 28; Def. 56.1 ¶ 33, the Rider itself is clear.  It expressly amends and modifies the Purchase Agreement.  It reaffirms the purchase price of $2,995,000 and provides for modifications to the floor plan.  Specifically "[a]t Purchaser's request, Sponsor has agreed to deliver the Unit at closing without constructing the wall separating the Living/Dining Room/Kitchen and Bedroom 3."  Rider 2.  This had the effect of creating a three-bedroom unit, whereas the original plan envisioned a four-bedroom unit.  In addition, the Rider provides for a credit of $140,000 to be "credited to the Purchaser as an adjustment at the closing of title to the Unit."  *Id.*

The parties dispute various events that occurred between May 2007 and April 2008.  It is undisputed, however, that, during that period, construction on the Unit continued and that the Tenczas visited the Unit a number of times.  Def. 56.1 ¶¶ 35–36; Tencza Dep. 46–49.  Also undisputed is that (1) on or about June 19, 2007, the Tenczas received a title report for Unit 800,

4

Def. 56.5 ¶ 34; and (2) on or about January 25, 2008, during a visit to the Unit, the Tenczas inspected the Unit and identified items of "punch list" work they claimed still needed to be done, Def. 56.1 ¶ 42.

On April 16, 2008, the New York City Department of Buildings issued a temporary certificate of occupancy ("TCO") for the entire Condominium, including Unit 800.  As of this date, the parties agree that the Unit was physically habitable and ready for occupancy.  Soloway Decl. Ex. N; Def. 56.1 ¶¶ 43, 45–46.  The following day, the Tenczas were notified by email of the TCO.  Soloway Decl. Ex. Q; Def. 56.1 ¶ 48.

On April 28, 2008, the Tenczas and TAG entered into an agreement.  It states that "as a condition of the closing, Unit Owner requested and Sponsor performed certain punch list work," but that "there remain a few items from the Punch List Work which have not been completed in the Unit as of the date hereof."  *See* Fleiss Decl. Ex. 11 (the "Punch-List Agreement"); Def. 56.1 ¶ 55.  TAG agreed to complete the remaining punch-list work in a timely manner.  *See* Punch-List Agreement ¶ 1.  In return, the Tenczas agreed to the following "as-is" clause:

> Unit Owner (i) accepts the Unit in its "as is" condition on the date hereof and (ii) Unit Owner hereby releases and forever discharges Sponsor and its successors and/or assigns, from all manner of actions, causes of action, suits, debts, dues, sums of money, damages, claims and demands whatsoever in law or equity, which Unit Owner, its successors and assigns ever had, now have, or may have, now or hereafter upon or by reason of any matter arising from or out of the Punch List Work (other than the Surviving Punch List Work).

*Id.* ¶ 2.  The Punch-List Agreement, dated April 28, 2008, recites that "the closing of title to the Unit has occurred as of the date of this Agreement."  Punch-List Agreement 1.  Notwithstanding this provision, the parties (as discussed *infra* pp. 13–15) dispute when the closing on Unit 800 occurred.  Pl. 56.1 ¶ 35.

5

Approximately nine months later, in or around the end of 2008 and the beginning of 2009, the Tenczas moved into the Unit.  Tencza Dep. 76–77; Def. 56.1 ¶ 63.

After moving into the Unit, the Tenczas made some changes to it, although, as discussed below, *see infra* pp. 22–23, the parties dispute the precise nature and characterization of these changes.  The Tenczas admit that they (1) had the walls painted and the windows tinted, (2) hung window treatments, (3) added pavers on the terrace, and (4) installed electrical outlets and lighting fixtures, a sound system, an alarm system, and an unattached "island" in the kitchen.  Pl. 56.1 ¶ 37; Def. 56.1 ¶ 64.  TAG does not dispute these facts, but adds that the pavers added by the Tenczas were installed on areas of the terrace and roof space that had already been completed by TAG, and that the kitchen island, although unattached, is so large as to be immovable without mechanical assistance.  Pl. 56.1 ¶ 37; Def. 56.1 ¶¶ 65–66.

On April 23, 2009, the Tenczas, via their lawyer, sent a letter to TAG stating that they were exercising their right to revoke the Purchase Agreement under §§ 1703(c) and (e) of ILSA.  Fleiss Decl. Ex. 10; Pl. 56.1 ¶ 38.  The letter stated that upon receipt of the purchase price of the condominium, plus closing costs, apportionments, and accrued interest, the Tenczas would tender the deed and convey the Unit back to TAG.  Fleiss Decl. Ex 10  The record does not reflect whether TAG responded to this letter, only that it is undisputed that "TAG refused to acknowledge or honor the Tenczas' revocation."  Pl. 56.1 ¶ 39.

On May 6, 2010, the Tenczas filed their Complaint in this action.  Dkt. 1 ("Compl.").  Their single cause of action is based on ILSA.  The Tenczas ask the Court to "revoke[e] and rescind[] the Purchase Agreement and award[] Plaintiffs the amount of $2,880,000 with interests, costs, and attorney's fees."  Compl. ¶¶ 32–37.

Separately, on May 25, 2010, the Tenczas, along with other unit owners in the Condominium, filed suit in state court against TAG and others (the "*Trice* litigation").  *See* Fleiss Decl. Ex. 26.  The *Trice* plaintiffs alleged breach of contract, fraud, negligence, and unjust enrichment, and sought $20 million in money damages.  This lawsuit is relevant here solely insofar as TAG has asserted an affirmative defense of waiver, *see* Ans. ¶ 85, in which it argues that the Tenczas' participation in the Trice litigation is inconsistent with this action and estops them from seeking revocation.  On December 19, 2012, an amended summons and second amended complaint were filed in the *Trice* litigation, which list "The Board of Managers of the Arris Lofts Condominium" as the plaintiff, rather than the individual unit owners.  Fleiss Decl. Ex. 27.  The Tenczas are no longer listed as plaintiffs.

The Tenczas continue to reside in the Unit.  Pl. 56.1 ¶ 40; Def. 56.1 ¶ 67.

## II.    Discussion

The Tenczas move for summary judgment as to liability.  They argue that because (as is undisputed) TAG did not file a statement of record with HUD or provide the required property report to the Tenczas, the Tenczas had an absolute right to revoke their purchase of the Unit. They further argue that TAG's affirmative and equitable defenses are unavailable under ILSA.[4]

TAG cross-moves for summary judgment.  Its grounds are that (1) ILSA does not apply to condominium units; (2) the Unit's sale was exempt under the Improved-Lot Exemption; (3) the contract of sale cannot be revoked because it has merged into the deed issued to the Tenczas;

---

[4] The Tenczas had separately argued that TAG failed to comply with ILSA by not including in the Purchase Agreement a description of the Unit in a form acceptable for recording under New York law.  *See* Pl. Br. 13–14.  That argument, however, was foreclosed by a Second Circuit decision issued while this motion was being briefed.  *See Bacolitsas*, 702 F.3d at 681–83; Dkt. 55 (letter advising Court of this controlling authority).

(4) the Tenczas retrospectively waived their claim; and (5) the sale cannot be rescinded because the Unit is not in substantially similar condition as when it was sold.

For the reasons that follow, the Court holds that ILSA does apply to the sale of condominium units, including the Unit, and that the Unit was not exempt as an improved lot. The Court further holds that the Tenczas' right to revocation under ILSA was not extinguished by merger of the purchase agreement into the deed, and that the Tenczas did not knowingly and voluntarily waive any right to that remedy. Finally, the Court holds that the issue of whether the Unit is in substantially similar condition as when it was sold goes to damages, not to the Tenczas' ability to revoke the sale. Summary judgment as to liability is thus merited in favor of the Tenczas.

### A.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

### B.      Applicability of ILSA to Condominiums

In its provisions relating to the requirements of registration and property reports, ILSA provides that

> [i]t shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—
> (1) with respect to the sale or lease of any lot not exempt under section 1702 of this title—
>> (A) to sell or lease any lot unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title;
>> (B) to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee . . . .

15 U.S.C. § 1703(a)(1)(A)–(B). The statute's scheme is based chiefly on these disclosure requirements. The statute provides for the revocation of a purchase agreement where this property report is not supplied:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

*Id.* § 1703(c).

TAG argues that ILSA does not apply to the sale of condominiums, and that the Tenczas' theory of liability is therefore foreclosed. However, in a decision issued after this motion was fully briefed, a divided panel of the Second Circuit squarely held that ILSA does apply to condominiums. In *Berlin v. Renaissance Rental Partners, LLC*, No. 12-2213-cv, 2013 WL

1859140 (2d Cir. May 6, 2013), the court held that the CFPB and HUD had reasonably

interpreted the term "lot" in ILSA to apply to condominiums, and therefore that ILSA's

rescission remedy is available where a condo developer failed to provide the required property

report.[5]   The decision in *Berlin* is conclusive on this point:  ILSA unquestionably applies to

condominiums.  Accordingly, the Court rejects TAG's argument that ILSA is inapplicable.

### C.      ILSA's "Improved Lot" Exception Does Not Apply

TAG next argues that Unit 800 is covered by an exception to ILSA:  the "improved lot

exemption," which provides that

> the provisions of this chapter shall not apply to . . .
> (2) the sale or lease of any improved land on which there is a residential,
> commercial, condominium, or industrial building, or the sale or lease of land
> under a contract obligating the seller or lessor to erect such a building thereon
> within a period of two years . . . .

15 U.S.C. § 1702(a)(2).

Under HUD regulations, to qualify for this exemption, a condominium "either . . . must

be completed before it is sold, or it must be sold under a contract obligating the seller to erect the

unit within two years from the date the purchaser signs the contract of sale."  38 Fed. Reg.

---

[5]  Earlier decisions of the Second Circuit had pointed in the same direction.  *See Bacolitsas*, 702
F.3d at 676 (stating that, "[i]n basic terms, ILSA protects individual buyers or lessees who
purchase or lease lots in large, uncompleted housing developments, *including condominiums*, by
mandating that developers make certain disclosures" (emphasis added)); *Bodansky*, 635 F.3d at
75 (applying ILSA to condominium sales without expressly determining that it applied); *see also
Rai v. WB Imico Lexington Fee, LLC*, 851 F. Supp. 2d 615, 623 (S.D.N.Y. 2012) ("Courts within
and outside this District have uniformly applied ILSA to the sale of condominiums."); *Nu-Chan,
LLC v. 20 Pine St. LLC*, No. 09 Civ. 00477 (PAC), 2010 WL 3825734, at *3 (S.D.N.Y. Sept. 30,
2010) ("Several decisions of Southern District of New York, many of them recent, have accepted
HUD's analysis, and applied ILSFDA to condominium units.").  Judge Holwell, to whom this
case was previously assigned, had held in this case that ILSA does apply.  *See* Dkt. 18, 803 F.
Supp. 2d 279, 283 (S.D.N.Y. 2011).  Based on HUD's interpretations of the term "lot" and
extensive case authority, Judge Holwell held that "with certain exceptions discussed below, the
requirements of ILSFDA generally apply to condominium units such as the Unit Plaintiffs
purchased."  *Id.*

23,866 (Sept. 4, 1973).  Here, it is undisputed that the contract did not obligate TAG to erect the unit within two years from purchase.  Thus, whether this exception applies depends on whether the unit was complete at the time of purchase.  HUD guidelines state that "[f]or a building or unit to be considered complete, it must be physically habitable and usable for the purpose for which it was purchased.  A residential structure, for example, must be ready for occupancy and have all necessary and customary utilities extended to it before it can be considered complete."  61 Fed. Reg. 13,596 (Mar. 27, 1996); *see Nu-Chan*, 2010 WL 3825734, at *3–4.

The Tenczas and TAG disagree over the point in time at which TAG's compliance with ILSA is properly determined: in May 2007, when the Purchase Agreement was signed, as the Tenczas claim; or on April 28, 2008, when the Punch-List Agreement was signed, as TAG argues.  Because the TCO was issued on April 16, 2008, reflecting a determination that the Unit was habitable, whether the Unit was complete at the time it was purchased depends on which of these two contracts constitutes the effective sales agreement.  Because the Purchase Agreement, viewed in isolation, undisputedly would qualify as a sales contract under HUD's guidelines, the issue turns on how the Punch-List Agreement is characterized.  TAG argues that the Punch-List Agreement is a contract of sale under which the Tenczas agreed to accept the property as is and to go forward with the closing notwithstanding the open punch-list items; thus, it modified and ratified the Purchase Agreement, and its date determines whether the Improved Lot Exception applies.  *See* Def. Br. 16–18.  The Tenczas counter that the Punch-List Agreement does not speak to the purchase of the Unit, but is merely a follow-on agreement addressing the narrower issue of which items on the punch-list TAG would be responsible for tending to after the closing.  *See* Pl. Br. 8–9.

Under HUD's regulations, a "sale" is "any obligation or arrangement for consideration to purchase or lease a lot directly or indirectly."  24 C.F.R. § 1710.1(b).  Under that definition, and the principles of New York law that govern sales of real property, the Punch-List Agreement does not constitutes a contract of sale which obligated the Tenczas to purchase the Unit.

Important here, under New York law, a contract for the purchase of real property must include material terms of the deal.  *See* N.Y. Gen. Oblig. Law § 5-703(2).  This includes, for example, the consideration to be paid.  *See Chan v. Shew Foo Chin*, 872 N.Y.S.2d 689 (Sup. Ct. 2008) ("The price for the property is a material component of a real estate contract." (citing *Ansorge v. Kane*, 244 N.Y. 395 (1927)), *aff'd*, 62 A.D.3d 471 (1st Dep't 2009) ("[T]he documents relied on by plaintiffs herein are not sufficient in that they fail to establish an essential term of the agreement, namely the purchase price.").  The Punch-List Agreement references the Purchase Agreement in passing in its recitals, but does not include any of the material terms of the sale; price is mentioned nowhere.  The Purchase Agreement, on the other hand, does include all material terms, including price.  *See* Purchase Agreement § 4.  Nowhere does the Punch-List Agreement obligate TAG to sell the Unit or obligate the Tenczas to purchase it.  The only mentions of the Unit's sale are as background, in the recitals—one refers to the Purchase Agreement; another, in fact, states that the sale has *already* occurred:  "[T]he closing of title to the Unit has occurred as of the date of this Agreement."  *See* Punch-List Agreement 1.

Indeed, in the above ways, the Punch-List Agreement differs from the Rider, *see* Fleiss Decl. Ex. 8, which expressly amends and modifies the Purchase Agreement.  It includes the purchase price, and modifies it by contracting to provide a $140,000 credit to the Tenczas upon closing.  Unlike the Punch-List Agreement, the Rider is "incorporated into the [Purchase] Agreement and made a part thereof with the same force and effect as if therein originally

contained; in the event of inconsistencies between the Purchase Agreement and the Rider, the Rider governs." *Id.*[6]

The Court therefore concludes that the Punch-List Agreement was not a contract to purchase the Unit. For ILSA purposes, that contract was the Purchase Agreement. It follows that as of the time of the contract of sale, the Unit was not complete and ready for occupancy. The sale of the Unit therefore does not qualify for ILSA's Improved-Lot Exemption.

In a related dispute, the parties disagree over when, in fact, the closing took place. The date of the closing is not itself determinative under ILSA. Instead, it is relevant, at most, to the conclusion the Court is to draw as to whether the Purchase Agreement or the Punch-List Agreement is the operative contract of sale. The Tenczas contend that the closing had taken place as of the date of the Punch-List Agreement. TAG contends instead that the closing took place after the Punch-List Agreement, indicating that the Punch-List Agreement gave rise to the Tenczas' ultimate obligation to purchase the Unit, notwithstanding unfinished punch-list work. Although the Court's ruling that the contract of sale was the Purchase Agreement (and not the Punch-List Agreement) would stand regardless of the resolution of the dispute over the closing date, all admissible evidence on this point favors the Tenczas, in that it shows that the closing had occurred as of the Punch-List Agreement.

Most revealingly, the Punch-List Agreement itself, executed by the parties, states that "the closing of title to the Unit has occurred as of the date of this Agreement." Thus, when the parties signed the Punch-List Agreement, they deemed the closing to have occurred on or before April 28, 2008. Consistent with this, the residential deed, which the parties both signed, is dated

---

[6] The Rider is dated May 8, 2007—the same date as the Purchase Agreement. Therefore, even if it were treated not as part and parcel of the Purchase Agreement but as a separate agreement modifying the Purchase Agreement and constituting the operative contract of sale, this would not affect the Court's analysis.

April 28, 2008.  Fleiss Decl. Ex. 9; Def. 56.1 ¶ 61.  Dated the same day is the mortgage agreement, *see* Soloway Decl. Ex. K, the letter releasing the down payment to TAG, *see* Tencza Decl. Ex. 23, and New York State tax documents, *see id.* Ex. 24; *see also* Def. 56.1 ¶ 57 (collecting other examples).  Finally, a letter from TAG to the Tenczas, dated April 28, 2008, is particularly telling.  It states:  "Congratulations on the successful closing of title to your Unit.  This is to confirm that on the date set forth above, the above-referenced Unit was conveyed to you in the name set forth above."  Tencza Decl. Ex. 17.  This evidence overwhelmingly demonstrates that the closing took place before the Punch-List Agreement, on or about April 28, 2008.

In the face of this evidence, TAG points to two materials which, it states, suggest a different closing date.  First, TAG points to the Tenczas' Complaint, which alleges that the closing took place on May 19, 2008.  Compl. ¶ 15.  But this recital does not create a material dispute of fact:  "Allegations in a complaint are not evidence," and a party cannot defeat a motion for summary judgment by relying on allegations in the pleading.  *Welch-Rubin v. Sandals Corp.*, No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *11 (S.D.N.Y. Mar. 26, 2003) ("[A] complaint is not admissible to prove the truth of its contents." (citing *Stevenson v. Hearst Consol. Publ'ns, Inc.*, 214 F.2d 902, 907 (2d Cir. 1954))); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'" (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

TAG also relies on Darius Tencza's deposition, in which he testified:  "[W]e agreed to sign the agreement and *proceed with the closing*."  Tencza Dep. 64 (emphasis added).  But this single statement does not create a question of material fact.  Darius's deposition contains inconsistent statements on this point:  At other points, Darius testified that the closing occurred in April, not May, 2008.  *See id.* at 46, 122.  Darius also testified that the Punch-List Agreement had been executed *at* the closing, which the documentary evidence uniformly corroborates, and that agreement was executed on April 28, 2008.  *Id.* at 59–60.  In the face of the numerous documents signed by both parties reflecting the closing date, no reasonable juror could conclude based on a stray statement by Darius, contradicted by all other evidence including his other statements, that the closing occurred after April 28, 2008.  TAG's contention that the closing occurred after the Punch-List Agreement was executed is thus rejected.  The evidence as to the closing date instead confirms the Court's conclusion that the Purchase Agreement was the operative contract of sale for ILSA purposes.

### D.    Merger

TAG next notes that, under New York law, the Purchase Agreement was extinguished at the closing and that it merged into the deed.  On this basis, it argues, ILSA's rescission remedy is unavailable, because ILSA does not expressly provide for rescission of a deed.  Def. Br. 18–20.

TAG is correct that under New York law a purchase agreement merges into a deed.  *See Schoonmaker v. Hoyt*, 148 N.Y. 425, 429–430 (1896); *Alexy v. Salvador*, 217 A.D.2d 877, 878 (3d Dep't 1995).  But it does not follow from that state-law principle that ILSA's rescission remedy is unavailable.

To begin with, the New York principle of merger serves to extinguish only claims based on the pre-deed contract of sale:  "Any claims that the plaintiff may have had based on the

contract of sale are 'extinguished by the doctrine of merger.'"  *Waverly Props., LLC v. KMG Waverly, LLC*, 824 F. Supp. 2d 547, 563 (S.D.N.Y. 2011) (quoting *Rothstein v. Equity Ventures, LLC*, 299 A.D.2d 472, 475 (2d Dep't 2002)); *see also Alexy*, 217 A.D.2d at 878 ("Fundamentally, prior negotiations and agreements regarding the sale of land merge into and are extinguished by the deed of conveyance and any inconsistencies between the contract and the deed are presumed to be explained and governed solely by the latter.").  But the Tenczas' claims are not based on the terms of their contract with TAG.  Rather, they are federal statutory rights based on ILSA.  They exist regardless of the terms of the contract.  Indeed, a contract for the sale of land cannot prospectively waive compliance with ILSA.  *See* 15 U.S.C. § 1712 ("Any condition, stipulation, or provision binding any person acquiring any lot in a subdivision to waive compliance with any provision of this chapter or of the rules and regulations of the Director shall be void.").  And, as the Second Circuit has emphasized, Congress's concern in ILSA was to regulate disclosure, not to regulate the mechanics of conveyance or address the state contractual rights that survive a closing.  *See Bacolitsas*, 702 F.3d at 681 ("ILSA's origins confirm that Congress was concerned with disclosure, *not* conveyance." (emphasis in original)).

In any event, even if New York real estate law contemplated the extinction of statutory rights upon conveyance of a deed, ILSA is a federal law which, under the Supremacy Clause, New York law cannot displace.

> It is well established that federal law, and not state law, governs the remedies available in a lawsuit in federal court arising under a federal cause of action. . . . This conclusion is further supported by the principle that there is a strong federal interest in the uniformity of remedies available under a federal cause of action such as ILSFDA.  Indeed, the Supreme Court has long held that the very act of creating a federal cause of action is a strong Congressional indication of the federal interest in the uniformity of remedies available to a party aggrieved by a violation of federal law.

*Plant v. Merrifield Town Ctr. Ltd. P'ship*, 711 F. Supp. 2d 576, 590 (E.D. Va. 2010) (citations omitted).  Thus, a related basis for rejecting TAG's argument is uniformity.  Under TAG's construction, the statutory remedy of rescission would vary, post-deed, depending on whether the particular state had a common law of merger such as New York's.  But where federal law does not provide otherwise, a federal cause of action is intended to be applied uniformly—as the Second Circuit has explained.  *See Bacolitsas*, 702 F.3d at 682 (in ILSA, Congress sought to create "a national standard to guarantee full disclosure for the benefit of prospective buyers, not to harmonize local requirements for the conveyance of undeveloped lots.").

And the text of ILSA, in a variety of ways, emphatically refutes TAG's claim.  First, although ILSA casts its revocation remedy in terms of revoking a contract or agreement for the sale of property, *see* 15 U.S.C. § 1703(c), nothing in the statute limits that right to revocations during the pre-closing period or bars rescission where the purchase agreement has merged into a deed.  On the contrary, the only limits that ILSA imposes on purchasers in the Tenczas' posture are temporal:  It gives such purchasers a two-year time period from the signing of a purchase agreement to invoke the rescission remedy.  *Id.* § 1703(c).  The Tenczas undisputedly revoked their purchase within that period.  Moreover, the three-year statute of limitations that ILSA sets for a purchaser to bring suit to enforce its rights under § 1703 expressly provides that the remedy survives the delivery of a deed:

> No action shall be maintained under section 1709 of this title to enforce a right created under subsection (b), (c), (d), or (e) of section 1703 of this title unless brought within three years after the signing of the contract or lease, *notwithstanding delivery of a deed to a purchaser.*

*Id.* § 1711(b) (emphasis added).

Numerous other provisions of ILSA are inconsistent with the thesis that a purchaser's rescission rights expire upon the delivery of deed.  In other portions of the statute, Congress

curtailed the rescission right upon delivery of a deed.  Section 1702(b)(8), for example, exempts

from ILSA "the sale or lease of a lot in a subdivision containing fewer than three hundred lots

if . . . [among other requirements] the lot is free and clear of liens . . . *at the time of the signing of*

*the contract or agreement and until a deed is delivered to the purchaser* . . . ."  It did not do so,

however, in § 1703.  Similarly, ILSA creates an exception to the rescission remedy where,

"within one hundred and eighty days after the signing of the sales contract, the purchaser

receives a warranty deed."  *Id.* § 1703(d).  That ILSA does not similarly exempt other deeds

strongly indicates that Congress anticipated the rescission remedy surviving a deed, up until the

point when the two-year limitations period had run.

Further, ILSA expressly contemplates the return of a deed to the seller in order to effect

the rescission remedy.  Section 1703(e) requires that, in order to receive his payment price back,

"the purchaser or lessee tender[] to the seller or lessor . . . an instrument conveying his or her

rights and interests in the lot."  A deed is precisely that:  "[a] written instrument by which land is

conveyed."  Black's Law Dictionary 475 (9th ed. 2009).

In the one case in which TAG's argument has previously been made, it was rejected.  In

*Bettis v. Lakeland, Inc.*, 402 F. Supp. 1300, 1302 (E.D. Tenn. 1975), the defendant argued that it

was entitled to summary judgment "because Section 1703(b) [of ILSA] only allows rescission of

the 'contract' and 'agreement.'  Where there has been a valid delivery and acceptance of a deed,

so the argument goes, there is no 'contract' or 'agreement' to rescind since this document is

merged into the deed under common law principles."  *Id.*  The court rejected that argument:

> The ILSFDA provides specific exemptions to its operation.  15 U.S.C. § 1702.
> The delivery and acceptance of a deed is not a specific exemption.  Furthermore,
> to carve out this type of judicial exemption to the Act would render nugatory the
> obvious purpose of Section 1703(b) in protecting all purchasers of lots who
> bought without being shown a property report.

*Bettis*, 402 F. Supp. at 1302; *cf. Engle Homes, Inc. v. Krasna*, 766 So. 2d 311, 312 (Fla. Dist. Ct. App. 2000) (upholding rescission of deed under ILSA).  For these many reasons, the Court rejects TAG's argument that the Tenczas' rescission remedy under ILSA is unavailable because the contract of sale has merged into the deed.

### E.    Waiver and Other Affirmative Defenses

TAG next argues that, based on various equitable defenses, including bad faith, unjust enrichment, laches and waiver, the Tenczas may no longer pursue a rescission remedy.  These defenses are based on the Tenczas' conduct in living in the condo, bringing a lawsuit in state court, and/or accepting the deed.

With the exception of waiver, these defenses are unavailable as a matter of law.  As the Second Circuit has held, ILSA has created a strict liability regime in which affirmative defenses are unavailable:

> Pointedly, Congress gave purchasers an exclusive right to revoke and did not provide for affirmative defenses other than the revocation and limitations periods. . . . [W]e note that Congress enacted a *strict-liability revocation provision* to (1) ensure that registration and disclosure in fact occurs, (2) limit the costly oversight of federal agencies into an activity traditionally regulated by state and local governments, and (3) allow unsophisticated purchasers to enforce their rights.

*Bodansky*, 635 F.3d at 86 (emphasis added); *see also Rai*, 851 F. Supp. 2d at 630 ("In electing to create a strict liability regime, Congress made irrelevant a developer's good faith.").  Accordingly, it is irrelevant that the Tenczas cannot identify any harm to themselves from TAG's failure to file a statement of record with HUD or to provide the statutorily-required property report.  *See* Def. 56.1 ¶ 74.  As Judge Holwell noted in his opinion earlier in this case denying TAG's motion to dismiss, "it appears to be the law of this Circuit that equitable defenses

are not applicable in actions to enforce the automatic right to revoke under Section 1703(c)."
*Tencza*, 803 F. Supp. 2d at 291 (citing *Bodansky*, 635 F.3d at 86).

As to waiver, a purchaser can retrospectively release his rights under ILSA.[7]  But there is no evidence that the Tenczas did so here.  "Federal common law and New York common law both define waiver as an *intentional* relinquishment and abandonment of a *known* right or privilege."  *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 510 (2d Cir. 2002) (emphasis added).  TAG contends that the Tenczas retrospectively waived their rights under ILSA by inspecting the Unit, agreeing to accept the Unit "as-is" in the Punch-List Agreement, taking title, taking out a mortgage, living in the Unit, and suing to enforce the Purchase Agreement in state court in the *Trice* lawsuit.  *See* Def. Br. 22; Ans. ¶¶ 83–86.  None of these rises to the level of a waiver, which must be knowing, voluntary, and intentional.  *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 303 (2d Cir. 1996); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982).  And the release term in the Punch-List Agreement limited the release to "claims . . . arising from or out of the Punch List Work."  *See* Punch-List Agreement ¶ 2.

---

[7] Section 1712 of ILSA states:  "Any condition, stipulation, or provision binding any person acquiring any lot in a subdivision to waive compliance with any provision of this chapter or of the rules and regulations of the Secretary shall be void."  15 U.S.C. § 1712.  But the cases that have addressed this provision's prohibition on waiver in this context have distinguished between prospective waivers of compliance and retrospective releases of claims.  *See Arcari v. 46th St. Dev. LLC*, No. 10 Civ. 3619 (PKC), 2011 WL 832809, at *4 (S.D.N.Y. Mar. 2, 2011) ("There is an important distinction between the waiver of compliance with the statute and a release of a claim for violating the statute."); *see also Katz v. Fifield Realty Corp.*, 746 F. Supp. 2d 1265, 1270–71 (S.D. Fla. 2010) ("No prospective waiver occurred here.  Rather, the parties merely terminated one agreement to purchase (the 2006 Contract) and entered into a replacement agreement (the 2008 Contract).  Under these circumstances, Section 1712 is inapplicable."); *Rensin v. Juno-Loudon, LLC*, No. 1:09CV1391 (JCC), 2010 WL 1138318, at *3 (E.D. Va. Mar. 17, 2010) (allowing retrospective waiver as part of termination agreement).

TAG has not put forward any evidence that the Tenczas knew of their rights under ILSA at the time they signed the Punch-List Agreement or took title to the Unit, let alone that in taking those actions, they were knowingly and intentionally relinquishing those rights.  TAG instead argues that, based on a district court decision from the Eastern District of Virginia, a party can waive unknown claims, including based on ILSA.  *See* Def. Br. 6 (citing *Rensin*, 2010 WL 1138318).  But even accepting that legal premise, the facts of *Rensin* are far afield from those here.  The "Residential Cooperation Agreement" that was held in *Rensin* broadly to waive the purchasers' claims stated that "the Rensins do hereby release Creighton from all claims, demands, obligations and duties of every kind and nature, known and unknown, except for those created and required by this Agreement."  *Id.* at *1.  As TAG conceded at argument, there is no agreement here, including the Punch-List Agreement, that contains any such general release or express waiver.

TAG instead relies on the inclusion in the Punch-List Agreement of an "as-is" clause.  *See* Punch-List Agreement ¶ 2 ("Unit Owner . . . accepts the Unit in its 'as is' condition on the date hereof . . . .").  In arguing that the Tenczas waived any claims arising out of TAG's ILSA obligations by assenting to that clause, TAG relies on a decision from the South Dakota state supreme court interpreting a purchase agreement and a South Dakota real estate disclosure statute, which, it contends, is "<u>directly</u> on point."  Def. Br. 5 (citing *Lucero v. Van Wie*, 1999 SD 109, 598 N.W.2d 893 (S.D. 1999)) (emphasis in original).

For two independent reasons, this argument does not prevail.  First, the South Dakota disclosure statute at issue in *Lucero* was not a strict liability statute and the court did not hold it to be.  Instead, it held that, absent fraud or misrepresentation, a freely-entered contract would outweigh the statutory disclosure requirement.  *Lucero*, 598 N.W.2d at 898.  There is no

comparable case holding that ILSA's disclosure obligation duties may be relinquished by such a clause.  Second, read in context, the as-is clause in the Punch-List Agreement is clearly addressed to a different issue: the condition of the Unit premises and the remaining punch-list work.  *See* Punch-List Agreement ¶ 2 and recitals.  It cannot credibly be read to relinquish statutory notice obligations, which fall outside the scope of that agreement.

TAG, finally, argues that the Tenczas waived their rights by participating in the *Trice* lawsuit.  That too is wrong, for several reasons.  First, the Tenczas brought *this* lawsuit before the *Trice* action was filed in state court.  *Compare* Dkt. 1, *with* Fleiss Decl. Ex. 26.  Second, the Tenczas are no longer even themselves plaintiffs in the *Trice* action; although they were initially plaintiffs, the Condominium's Board of Managers has replaced them.  *See* Fleiss Reply Decl. Exs. 26–27.  Third, TAG fails to explain coherently why the Tenczas' participation, briefly, in that lawsuit bespeaks a knowing waiver of their rights under ILSA.

### F.    "Substantially Similar"

In a final argument, TAG contends that, even if the purchase were rescinded, the Tenczas are not entitled to have their purchase money paid back because the Unit is not in a condition "substantially similar" to that in which it was conveyed.  Section 1703(e) does indeed address the situation in which "the rights and interests and the lot are in a condition which is substantially similar to the condition in which they were conveyed or purported to be conveyed to the purchaser or lessee."  15 U.S.C. § 1703(e).  TAG argues that the Tenczas have altered the Unit so that it is no longer substantially similar to its condition at the time of purchase, and that this bars revocation.  TAG complains that the Tenczas have changed the Unit's physical condition (by painting it and installing fixtures, and by contracting to have a wall removed before purchasing) and its title (by financing the purchase with mortgages, to which it is subject).

TAG's argument fails as a matter of law.  Section 1703(e)'s "substantially similar" requirement does not provide that property must be in such condition for the rescission remedy to be available.  Rather, it provides that where a purchase contract is revoked and the property is conveyed to the seller in a substantially similar condition, the purchaser "shall be entitled to all money paid by him or her under such contract or agreement."  *Id.* § 1703(e).  It does not state the converse, *viz.*, that if the property's condition is other than substantially similar to its condition at the time of purchase, the rescission remedy is unavailable.  On the contrary, ILSA describes in absolute terms the purchaser's right to revoke based on a violation of the statute.  *See id.* § 1703(c).  Accordingly, because the requirements for revocation are met, subsection (e) does not foreclose the remedy.  Subsection (e) does, however, imply that where the property is conveyed to the seller in other than substantially similar condition, the purchaser may be entitled to less than "all the money paid by him or her under such contract or agreement."  *Id.* § 1703(e). Because the Tenczas' summary judgment motion presently before the Court is addressed solely to issues of liability, not damages, the Court need not resolve now the measure of such a damages claim.

## CONCLUSION

For the reasons stated above, the Tenczas' motion for summary judgment as to liability is granted, and TAG's motion for summary judgment is denied.  The Clerk of Court is directed to terminate the motions pending at docket numbers 50 and 59.

This long-pending case over the Unit has now consumed substantial time and expenses of the parties.  Continued litigation will assure only that this litigation will prove economically disadvantageous, if not disastrous, for both parties.  The Court is hopeful that, with the issue of liability having been resolved, the parties are prepared promptly to engage in meaningful

discussions regarding settlement. To facilitate such discussions, the Court directs that counsel

for TAG and counsel for Tencza, each accompanied by at least one party representative with full

settlement authority, meet in person together during the 14 days beginning today (*i.e.*, by June

20, 2013), and that this meeting last at least two hours. The Court directs that plaintiffs' counsel

initiate contact with defense counsel to arrange this in-person meeting among the clients and

their counsel. The Court further directs that, on or by the 15th day after this meeting, *i.e.*, by

June 21, 2013, counsel submit a joint letter to the Court identifying the participants in the

meeting, the location of the meeting, and whether or not the meeting resulted in an agreement in

principle to settle this matter. Counsel are not to disclose to the Court the substance of their

discussions.

The Court further directs that, in the event a settlement agreement has not been reached,

the parties submit to the Court, by June 28, 2013, a joint letter setting out, in detail, the parties'

views as to how the parties wish and intend to proceed in this litigation, including how the

parties propose to proceed in executing the revocation of the contract of sale of the Unit and in

determining damages.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: June 6, 2013
New York, New York